IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:12-CR-00107-BR |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| CHRISTOPHER COOL WILMER, | |
| Defendant. | |

**S. AMANDA MARSHALL**
United States Attorney
**LEAH K. BOLSTAD**
Assistant United States Attorney
1000 S.W. Third, Suite 600
Portland, OR 97204-2902
(503) 727-1000

       Attorneys for Plaintiff

**LISA J. LUDWIG**
811 S.W. Naito Parkway, Ste. 500
Portland, OR 97204
(503) 223-5570

**JAMES L. MAHER**
P.O. Box 19973
Portland, OR 97280
(503) 892-2434

       Attorneys for Defendant

1 - OPINION AND ORDER

**BROWN, Judge**.

This matter comes before the Court on the Amended Motion (#92) to Suppress of Defendant Christopher Cool Wilmer who is charged in a four-count Indictment with Sex Trafficking of a Child (Count 1); Coercion and Enticement of a Minor (Count 2); Transportation of a Minor (Count 3); and violation of the Mann Act (Count 4), U.S.C. §§ 1591, 2422(b), 2423(a) and (e), and 2421 respectively.

For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendant's Amended Motion to Suppress as stated herein.

## BACKGROUND

All of the charges against Defendant arise from a police call to a Portland motel room where a police officer's knock on the door interrupted an act of prostitution (and likely other crimes) between a 16-year-old female and a 30-year-old customer. Although the room was registered to Defendant, he was not present when police arrived nor was he present as the investigation ensued and culminated in the warrantless seizure and inventory search of two items likely belonging to Defendant: (1) a black, zipped-closed duffel bag whose contents were not obvious and whose luggage tag bearing Defendant's name was turned so that the name was not visible in plain view and (2) a blue Walmart

2 - OPINION AND ORDER

shopping bag, which was secured by tied double handles at the top and which obviously held at least a pair of large, presumably men's, athletic shoes.

In his Motion Defendant seeks to suppress

> all evidence obtained by the government during seizures and searches of items purported to belong to him seized from room 216 of the Motel 6 at 9225 SE Stark Street in Portland, Oregon on February 22, 2012. The warrantless seizures and searches of these items violated the Fourth Amendment to the United States Constitution, and all items obtained from the searches should be suppressed.

The Court conducted an evidentiary hearing on March 25, 2013.

For the reasons that follow, the Court concludes the officers' warrantless entry into the motel room was reasonable and was justified by exigent circumstances necessitating the officers to take immediate steps to protect the 16-year-old girl in the room from further exploitation. The Court also concludes the officers' warrantless seizure from the motel room and subsequent inventory search of the two bags that purportedly belonged to Defendant were not justified by any exception to the warrant requirement.

## STANDARDS

I.  **Warrantless Entry into the Motel Room.**

Generally a warrantless entry of a private residence is presumptively unreasonable. *Brigham City, Utah v. Stuart,* 547

3 - OPINION AND ORDER

U.S. 398, 403 (2006). "'[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)).

"Exigent circumstances are present when a reasonable person [would] believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Alaimalo*, 313 F.3d 1188, 1192–93 (9th Cir. 2002)(citation and quotation omitted; alterations in original). *See also Dixon v. Wallowa County*, 336 F.3d 1013, 1018 (9th Cir. 2003).

The Fourth Amendment protection against unreasonable searches and seizures also applies to guests in hotel rooms. *United States v. Young,* 573 F.3d 711, 716 (9th Cir. 2009)(citing *Stoner v. State of Cal.,* 376 U.S. 483, 490 (1964)("No less than a tenant in a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures."). "The presumption of unconstitutionality that accompanies the warrantless entry . . . may be overcome only by showing 'consent

or exigent circumstances.'" *Lopez-Rodriguez v. Mukasey,* 536 F.3d 1012, 1016 (9th Cir. 2008).

## II. <u>Warrantless Seizure and Search of Two Bags from the Motel Room</u>.

Under the Fourth Amendment evidence may be suppressed as "fruit of the poisonous tree" if found to be the product of an unreasonable search or seizure. *United States v. Pulliam,* 405 F.3d 782, 785 (9th Cir. 2005)(citing *United States v. Segura*, 468 U.S. 796, 815 (1984)(warrantless searches and seizures are "*per se* unreasonable" unless they fall within one of the exceptions to the warrant requirement). *See also United States v. Russell,* 436 F.3d 1086, 1094 (9th Cir. 2006)(citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott,* 705 F.3d 410, 416 (9th Cir. 2012).

"[A]n essential to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First not only must the item be in plain view; its incriminating character must be 'immediately apparent.'" *Horton v. Cal.,* 496 U.S. 128, 136 (1990). *See also United States v.*

*Lemus*, 528 F.3d 958, 964 (9th Cir. 2009). "The second requirement of the plain view exception, that the incriminating nature of the evidence be 'immediately apparent,' focuses on whether the officers had 'probable cause to believe [the items] were associated with criminal activity.'" *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005)(quoting *Roe v. Sherry,* 91 F.3d 1270, 1272 (9th Cir. 1996)).

## FINDINGS OF FACT

The following three Portland police witnesses testified at the evidentiary hearing: Officer Joshua Howery, Officer Lawrence Eugene Keller, and Detective Maury Jay Mudrick. There were not any contradicting witnesses called.

The Court finds each of the witnesses testified truthfully to the best of his ability, and any variances between their accounts are the normal type of inconsistencies expected from witnesses generally. In any event, the Court does not have any reason in this record to distrust the officers' accounts.

Having carefully weighed and evaluated the testimony of the witnesses and the exhibits received in evidence and having considered the arguments of counsel, the Court finds the following facts by a preponderance of the evidence:

1. On the night of February 22, 2012, "K.W.," an 18-year-old female, called 911 to ask for police assistance in retrieving

her personal belongings from Room 216 at the Motel 6 located at N.E. Sandy Blvd. and 92nd Avenue.  This Motel 6 is well known by police to be associated with prostitution activities and is just ten blocks from S.E. 82nd Avenue, also known as "the Track," the "Blade," and "the Avenue" because prostitutes regularly meet customers there.

    2.   Officer Keller, a patrol officer with about 18 years of experience at the time, was dispatched to and met K.W. at a Taco Bell parking lot across the street from the Motel 6 at about 10:40 p.m.  Officer Howery, another on-duty patrol officer who had about 11 years of experience at the time and who had recently completed about three years of specialized experience dealing with "street prostitution" and juvenile sex trafficking, decided to cover and to assist Officer Keller, drove to the Taco Bell lot, and joined Keller's discussion with K.W.  Officer Howery had Officer Marshall, a police trainee with him.

    3.   K.W. told Officers Keller and Howery that she was a prostitute whose pimp, known to her as "Cool," had rented Room 216 where she still had some belongings.  She wanted to "get out" of prostitution and she wanted to retrieve her belongings from the room, but she was refused access and did not feel safe going back to the room alone.  K.W. said another "girl" also was prostituting from Room 216, but it was unclear to the officers who exactly might be in Room 216 at the time.

7 - OPINION AND ORDER

4.   Officer Howery left Keller and K.W. and contacted the Motel 6 clerk.  Officer Howery learned Room 216 was registered for two adults but under the single name "Christopher Cool Wilmer" with 5/17/83 as Wilmer's date of birth.  Officer Howery "ran" that information in the Portland Police Bureau database and learned Wilmer had a 2010 arrest for promoting prostitution.  Officer Howery also located Wilmer's mugshot and Department of Motor Vehicles photo and noted Wilmer was a "male black."

5.   Officer Howery returned to the place where Officer Keller and K.W. were.  Officers Howery and Keller decided they would knock on the door of Room 216 to see whether someone would answer and release K.W.'s belongings.  They (and probably Officer Marshall) left K.W. in the company of another officer and went to Room 216 on the second floor of this two-story, "L-shaped" building in which all doors opened to the outside.  There was not any window or other means to see inside the room.  One of the officers, probably Officer Keller, knocked on the door without identifying himself, without making any demands, and without saying anything.

6.   A young, bare-shouldered girl, "N.B.," who appeared to Officer Keller to be about 15 years old, answered the door by opening it approximately 30% of the way revealing only her upper body.  As she asked "What the fuck is going on?", Officers Keller and Howery saw an Asian male about 30 years old, who definitely

was not the "male black" to whom the room was registered, near the bed pulling up his pants from down around the middle of his legs.

    7.   The officers reasonably concluded they had interrupted a sex crime in progress between a female juvenile and a much older Asian adult male.  Without a warrant, without consent, and for the purpose of putting a stop to what was going on for N.B.'s protection, Officer Keller pushed the door open further.  Officer Keller saw N.B. was fully naked, stepped into the room, and determined there was no one else present by "visually" clearing the relatively small room.  While the officers saw duffel bags and other such items around the floor, they noted in particular that neither a "male black" nor Christopher Cool Wilmer was present.

    8.   Officer Howery, who remained just outside the door, concluded "Dewey" was N.B's prostitution customer, called "Dewey" out of the room, and took him to a police car.

    9.   Officer Keller remained in the room with N.B.  He asked N.B. how old she was and learned she was 16.  N.B. said the Asian male was her "boyfriend," a term that police know prostitutes use for their customers, but the only name N.B. had for him was "Dewey."  Officer Keller informed Officer Howery that N.B. was only 16.

    10.   When they reached the police car, Officer Howery

handcuffed "Dewey," placed him under arrest for "patronizing prostitution" in violation of Oregon law, and gave him *Miranda* warnings. Officer Howery learned his name was Dewey Nguyen and that Nguyen knew N.B.'s correct first name but did not know her last name. Officer Howery left Nguyen with another officer who transported Nguyen to East Precinct.

11.  While Officer Keller waited for Officer Howery's return, Officer Keller kept the motel room door open and stood so that he could be viewed through the open doorway while facing outward with his back to N.B., who he directed to sit near the head of the bed. For officer-safety reasons, Officer Keller did not permit N.B. to get dressed or to reach for anything, including clothing, while he was alone with N.B.

12.  Officer Keller allowed N.B. to dress as soon as Officer Howery returned to the room and entered it. What had started as a call to assist K.W. in retrieving her belongings from the room had, in the officers' view, now become "an active sex-trafficking-of-a-minor case." While Officers Howery and Keller continued to talk with N.B., she never asked them to stop or to leave, and she was appropriately responsive to their questions.

13.  While still in the room with Officers Keller and Howery, N.B. told them that she was from the Tacoma, Washington, area and had been advertised as an "escort" on Backpage.com,

which Officer Howery knew hosted prostitution ads.  In particular, such Portland ads on Backpage.com would note a general area (S.E. Portland or I-205), would include a telephone number to facilitate texting communication between the prostitute and the customer, would note rates for an hour or a half-hour, and would typically produce multiple "dates" in series for the same night in the same motel room.

14.  By this point it was clear to the officers that they would not be allowing 16-year-old N.B., the apparent under-age victim of a sex-trafficking crime, to remain alone in the motel room.  In particular, the officers were concerned there was nothing to prevent her from continuing with other "dates" in the room that night, and, because she was a juvenile, the officers believed they needed to transport N.B. in protective custody, to find her a safe place to stay, and to connect her with appropriate resources.  Thus, the officers decided they would first take her to East Precinct.

15.  There was also, however, the unresolved issue of K.W.'s belongings and what, if anything, to do with the other "bags" in the room.  The officers asked N.B. to point out the property that belonged to K.W., and N.B. complied.  N.B. also said "everything else (in the room) is mine" except for the black duffel bag (which was zipped closed and had two paper, travel-type tags attached that were turned in a way that did not reveal any

identifying information) and the blue Walmart shopping bag with large athletic shoes visible in the opening.  Both of these bags were on the floor next to the bed.  Although N.B. declined to say who owned those two bags, both Officers Keller and Howery noted the shoes were "large" and, in fact, much larger than either K.W. or N.B. would wear.  They reasonably concluded they were men's athletic shoes.

    16.  Officer Howery knew N.B. could not rent the motel room on her own as a juvenile and that the room was registered to Christopher Cool Wilmer, who Officer Howery suspected was the same person as "Cool" and the probable pimp for K.W. and N.B.  Officer Howery suspected the black duffel bag and the blue Walmart bag belonged to Wilmer and that N.B. declined to name him out of loyalty to him and a desire to protect him.  Officer Howery was also attentive to the possibility that anything in the room might be evidence that could identify the pimp and link the pimp to the crime just interrupted.

    17.  Officer Howery returned to the Motel 6 clerk and reported Room 216 had been used for prostitution with a minor female.  The clerk responded he wanted "everybody" out and requested the officers to take all of the belongings "if they had room" to do so.

    18.  Officer Howery went back to Room 216.  He and Officer Keller assisted N.B. and K.W. in collecting their property to

take with them to East Precinct.  Officer Howery determined he would also take as "evidence of a crime"[1] the black duffel bag and the blue Walmart bag that he suspected belonged to the pimp responsible for promoting N.B.'s prostitution with Dewey Nguyen. Officer Howery intended to have the bags logged into the police property room as "evidence of a crime" which, in turn, would trigger an inventory search of the bags pursuant to Portland Police Bureau policy.

    19.  More than 30 minutes passed between the time the officers knocked on the door of Room 216, which likely was after 11:00 p.m., and the time they left for East Precinct with K.W., N.B., and all of the property including the black duffel bag and the blue Walmart bag.  Nguyen was out of Room 216 and in police custody within a few minutes after N.B. opened the door to the room in response to the officers' knock.  Thus, the officers and N.B. were present in the room for at least 25 minutes after Nguyen was removed during which time N.B. dressed; the officers spoke with her; and the officers made observations of that which was in plain view, including the two bags at issue in this Motion, but the officers did not open any drawers or containers

---

[1] Officer Howery also testified he took these bags to comply with the motel clerk's request to remove all of the guests' property from the room, but government counsel made clear at the hearing that the government is not relying on the clerk's direction to the officer as a justification for the warrantless seizure of the two bags.

13 - OPINION AND ORDER

in the room.

20.  Detective Mudrick was paged to East Precinct to join the investigation at 0040 hours on February 23, 2013.  After he arrived there, he worked for several hours interviewing K.W. and N.B.  Eventually he turned his attention to the black duffel bag and the blue Walmart bag, which he received from either Officer Keller or Officer Howery.  He photographed the bags.  Examining the luggage tags on the black duffel bag, he was the first to note that one of them bore the name of "Chris Wilmer" with a Tacoma, Washington, address.

21.  Detective Mudrick understood Officers Keller and Howery took the bags into police possession as "evidence" of the various prostitution crimes being investigated.  Thus, pursuant to the Portland Police Bureau's policy, the bags were to be lodged in the property room with an evidence receipt.  Before the bags could be lodged as evidence, the policy also required an inventory of the contents of each item to protect against, among other things, the risk of harmful material or contraband being stored unknowingly in the property room and/or the risk that police might later be accused of taking any valuables that were present but not inventoried.  Thus, Detective Mudrick searched and inventoried each bag.  He noted all of the contents seemed to belong to a male, and there were not any essentially "female" contents.

14 - OPINION AND ORDER

**DISCUSSION**

Defendant contends any evidence seized and searched by the government as a result of the officers' warrantless entry into the motel room should be suppressed because he did not consent to the search, no one present in the motel room had the authority to consent to the search, and there was not any other justification for the warrantless entry.

Defendant's Motion raises three Fourth Amendment issues: (1) whether exigent circumstances existed when N.B. opened the door to Room 216 in response to the officers' knock, permitting them to enter the room without first obtaining a warrant; (2) if such exigency authorized the officers' warrantless entry, whether the exigency continued after the occupants of the room had been secured, during which time the officers found and seized the black duffel bag and the blue Walmart bag that were in plain view; and (3) whether the seizure and search of the bags was justified by any exception to the warrant requirement.

I.  **Entry into the Motel Room.**

The Court concludes the information K.W. provided to the officers regarding a "girl" prostituting in Room 416 and the officers' follow-up inquiry as to the identity and criminal "pimping" history of the renter of the motel room was sufficient

15 - OPINION AND ORDER

to give the officers reason to knock on the motel room door to make a further inquiry.  The Court also concludes when the door was opened by a bare-shouldered teen-age girl who looked to be about 15 and who was with a much older male in plain view who was next to the bed and in the process of pulling up his pants, the officers had a reasonable basis to conclude that they had just interrupted a sex crime with a minor and that it was necessary to enter the room immediately to protect the girl from further sexual exploitation.

Accordingly, the Court concludes the officers' entry into the motel room without a warrant was reasonable and justified by exigent circumstances, and, to this extent, the Court denies Defendant's Motion.

## II. **Seizure and Search of the Bags**.

The issue remains, however, as to whether exigent circumstances or another exception to the warrant requirement justified the officers' warrantless seizure and ultimate search of the two bags they suspected belonged to Defendant.

The government asserts the officers were entitled to seize the bags because they were evidence of a crime in plain view in that they were "a link between the person who entered the room

16 - OPINION AND ORDER

[with the bags] and prostitution activity taking place therein."[2]

According to Defendant, however, any exigency that justified the officers' warrantless entry into the motel room was immediately dissipated when they removed Nguyen and before they observed the two bags and determined they might belong to Defendant.  Moreover, Defendant argues the officers did not have any particularized reason to suspect the two bags were associated with criminal activity allegedly taking place in the room.  In any event, because the luggage tag had to be turned over to note Defendant's name, the officers did not have any justification to manipulate or to "search" the tag for that purpose without a warrant.  Thus, Defendant argues he still had a reasonable expectation of privacy as to those bags, and he argues the warrantless seizure and search of the bags violated his rights under the Fourth Amendment.

**A.   Continuing Exigency.**

As noted, Defendant argues any exigency that allowed the police officers to enter the motel room in the first place was sufficiently dissipated almost immediately, and, therefore, the

---

[2] In its Response to Defendant's Motion, the government also asserted that when the motel manager was informed of the alleged activity in the motel room and ordered everyone out, Defendant lost any reasonable expectation of privacy that he might have had in the bags located in the room.  As noted, however, at oral argument the government clarified that it did not rely on the motel clerk's request that the guests' property be removed as a justification for the warrantless seizure of the two bags.

17 - OPINION AND ORDER

identification, seizure, and ultimate search of the bags that were in plain view was not justified by any exception to the warrant requirement.

The Court agrees with Defendant that N.B.'s safety was achieved and the immediate exigency to protect her was addressed within a few minutes of the officers' warrantless entry into the motel room.  Nevertheless, the officers acted reasonably in taking less than 25 minutes after Nguyen was removed to gather the basic facts from N.B. and to allow N.B. to dress and to collect her things.  Defendant has not cited and the Court has not found any case requiring officers to make an instantaneous retreat from premises they entered based on exigent circumstances.  Here the Court concludes the officers were still legally present in the room when they observed the bags in plain view during the period in which they were still dealing with N.B.

Accordingly, to this extent, the Court denies Defendant's Motion.

  B. **Evidence of a Crime**.

The Court concludes that although the bags were in the officers' plain view while they were lawfully present in the motel room, there was nothing about the nature of the bags or the partial contents of one of the bags that suggested any direct relationship between those bags and the suspected criminal activity going on in the room.  In other words, the bags did not

have any "immediately apparent" incriminating character.  *See United States v. Stafford,* 416 F.3d at 1068.  In light of the relatively innocuous nature of the bags, the Court concludes the officers were not justified in seizing them without a warrant.

Accordingly, the Court concludes the government has not shown the officers' seizure of the bags was justified by the "plain view" exception to the warrant requirement, and the government has not established any other applicable exception to the warrant requirement that would justify the seizure and search of the two bags.  Thus, to this extent, the Court grants Defendant's Motion.

In summary, the Court **CONCLUDES** the officers' entry into the motel room without a warrant was lawful based on exigent circumstances necessitating them to take steps to protect the 16-year-old girl in the room from further sexual exploitation. The Court also **CONCLUDES** that although the government has shown the two bags were in plain view while the officers were lawfully present in the room, the government has failed to establish any "immediately apparent" incriminating character of the bags. Accordingly, the government has not shown the bags were seized pursuant to the plain-view exception or any other exception to the warrant requirement.  It follows, therefore, that the officers' examination of the luggage tag identifying Defendant after the duffel bag was seized and the results of the inventory

19 - OPINION AND ORDER

search of both bags must be suppressed.

## CONCLUSION

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Amended Motion (#92) to Suppress as stated herein.

IT IS SO ORDERED.

DATED this 11th day of April, 2013.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

20 - OPINION AND ORDER